**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| UNITED STATES OF AMERICA, | |
|---|---|
| v. | Criminal No. 10-201 |
| THOMAS WADE, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge.

Pending before the court are a motion for a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) (ECF No. 57) and a motion to suppress evidence (ECF No. 37) filed by Defendant Thomas Clay Wade ("defendant" or "Wade") in the above-captioned case.   On October 12, 2010, a federal grand jury in the Western District of Pennsylvania returned a two-count indictment charging defendant with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and with possession with intent to distribute crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii).  (ECF No. 1.)

On June 28, 2011, defendant submitted an omnibus pretrial filing.  (ECF No. 37.)  That filing contained: (a) a motion to suppress the drugs and shotgun which were found in the search of Wade's residence; (b) a motion to suppress several confessions made by Wade; (c) a motion for early disclosure of Jencks materials; (d) a motion for early disclosure of <u>Brady</u> materials; (e) a motion for disclosure and exclusion of any evidence of defendant's prior bad acts; (f) a motion for a court order requiring law enforcement agents to retain all rough notes and writings relating to Wade's case; (g) a motion to reveal the identity of the confidential informant who assisted in Wade's investigation;  and (h) a motion for leave to file a supplement to defendant's pretrial

motions.  (Id.)  Defendant concurrently filed a brief in support of his motions.  (ECF No. 38.)

On September 19, 2011, Wade filed a supplemental pretrial motion requesting disclosure of the identity of the confidential informant used to arrange the controlled buy which ultimately resulted in his arrest.  (ECF No. 48.)  The supplemental motion requested the confidential informant's telephone number as a purported alternative to disclosing his identity.  (Id.)  On September 19, 2011, the government filed responses to defendant's pretrial motions.  (ECF Nos. 47 & 50.)

On September 20, 2011, the court held a hearing on Wade's myriad pretrial motions.  The court denied without prejudice as moot defendant's motion for early disclosure of Jencks material.  The court denied without prejudice as moot defendant's motion for early disclosure of Brady material.  The court granted in part and denied in part Wade's motion to disclose and exclude uncharged misconduct evidence.  The court granted defendant's motion for an order to preserve and retain rough notes and writings.  The court denied without prejudice defendant's motion to suppress the drugs and shotgun found during the search of his home, denying defendant's request for a Franks hearing.  The court denied without prejudice defendant's motion to reveal the identity of the government's confidential informant.  The court granted the motion for leave to supplement and amend his pretrial motions.  The court denied defendant's supplemental motion to reveal the confidential informant's identity or telephone number (ECF No. 48).  The court took the parties' arguments under advisement with respect to defendant's motion to suppress his confessions and the fruits thereof, which was the only matter not resolved on the record at the hearing.  The court continued the hearing to November 22, 2011.

Subsequently, on November 4, 2011, Wade filed a supplemental motion for a Franks hearing.  (ECF No. 57.)

At the continued hearing held on November 22, 2011, the court heard arguments and testimony regarding (a) the motion to suppress Wade's confessions and the fruits thereof, the only issue remaining from Wade's omnibus pretrial filing (ECF No. 37), and (b) the motion for a Franks hearing (ECF No. 57). The court set an additional hearing on the motions, which was ultimately held on January 9, 2012. At the conclusion of the January 9, 2012 hearing, the court ordered the parties to file proposed findings of fact and conclusions of law on the two remaining matters. The parties submitted their proposed findings and conclusions on February 24, 2012.

During the three evidentiary hearings on these motions, the court heard testimony from the following government witnesses: (a) Officer William Churilla ("Churilla"); (b) Officer Kevin Merkal ("Merkal"); (c) Officer David Lincoln ("Lincoln"); and (d) Officer William Kelsch ("Kelsch"), all of whom are employed by the Pittsburgh Police Department. Defendant testified. He called the following defense witnesses: (a) Ronald Getner ("Getner"), a private investigator hired to assist in his defense; (b) Kenneth Bush ("Bush"), an acquaintance of defendant whose cell phone was used to place several telephone calls to Wade on the day of the controlled buy; (c) William Smith ("Smith"), a friend of defendant who called Wade on the telephone on the day of the controlled buy; and (d) Shaniqua Johnson ("Johnson"), who was a passenger in Wade's car when it was pulled over by police.

The issues presented in this memorandum opinion and order are (a) whether defendant is entitled to Franks hearing, and (b) whether the court must suppress Wade's confessions as the fruit of an allegedly illegal traffic stop. Defendant argues, in support of the motion for a Franks hearing, that Churilla and Merkel—the dual affiants (see Jan. 28, 2010 Search Warrant (ECF No. 49-1) at 2)—made false statements in the affidavit supporting the application for a warrant to search Wade's residence. Specifically, Wade postulates that no controlled buy was arranged, no

confidential informant existed, and that the officers invented the story surrounding the confidential informant in order to manufacture probable cause for the warrant. Evidence was presented at the various hearings on these pending motions regarding defendant's phone records on the day of the controlled buy.

Upon consideration of the parties' submissions and the evidence and testimony presented at the suppression hearing, the court makes the following findings of fact and conclusions of law:

## I.    Findings of Fact

### A.  The Controlled Buy and Search Warrant

1.      This case involves information obtained from a confidential informant (the "CI"). (Hr'g Tr. Sept. 20, 2011 ("September Transcript") (ECF No. 58) at 50.)

2.      On December 24, 2009, Churilla and other Pittsburgh police officers detained the CI for attempting to sell baby powder to police officers. (Id. at 52.)  The CI attempted to pass off the baby powder as an illegal drug. (Id.)  The CI agreed to provide information to police in exchange for their not filing charges against him for his attempted sale of sham drugs. (Id. at 52-53.)  He told police he knew about a person selling drugs in Lawrenceville, Pennsylvania. (Id. at 53.)  The CI did not know the real name of the drug dealer in Lawrenceville. (Id. at 54.)  He knew the man by the street name of "Spider." (Id.)  The investigation led to Wade and his home at 3828 Penn Avenue in the Lawrenceville neighborhood of Pittsburgh, Pennsylvania ("Wade's residence" or the "residence"). (Id.)  Police believed that defendant was selling drugs from his residence. (Id.)

3.      On January 27, 2010, at approximately 6:30 p.m., Churilla and Merkel met the CI in anticipation of arranging for the CI to buy crack cocaine from Wade. (Id. at 57, 90.)  They

searched the CI to ensure that he did not have any contraband or money.  (Id.)  The CI used his cell phone to call Wade.  (Id. at 57-58.)  The CI arranged to buy a "fifty piece" of crack cocaine in exchange for fifty dollars.  (Id. at 59.)  After the phone call, Merkel left to set up surveillance on Wade's residence.  (Id. at 59-60.)  When he arrived at approximately 6:45 p.m., he contacted Churilla to let him know that he was in position, with an unobstructed view of the residence.  (Id. at 59-60, 132.)  Before Churilla and the CI left the police station, the CI was searched again. (Id.)  Churilla drove the CI to within walking distance of Wade's residence, and let him out of the car.  (Id. at 60.)  He gave the CI fifty dollars as he was leaving the car.  (Id.)

4.      Churilla telephoned Merkel to inform him that the CI was on his way to Wade's residence.  (Id. at 60, 132.)  The officers remained on the phone with each other.  (Id. at 133.) Churilla watched the CI walk toward the residence until Merkel could see the CI.  (Id. at 60.) Merkel had binoculars, but did not need to use them because he was situated approximately twenty-five feet from the front door of Wade's residence.  (Id. at 132.)  The CI did not stop to talk to anyone.  (Id. at 60.)  The CI was within the sight of at least one of the officers from the moment he exited Churilla's car to the moment he arrived back to meet Churilla after the drug purchase.  (Id. at 60, 133.)

5.      Merkel observed the CI arrive at a Wade's residence at approximately 7:00 p.m. (Id. at 132.)  Merkel did not observe any activity in or around Wade's residence during the fifteen-minute interim between his arrival and the CI's arrival.  (Id.)  Merkel observed the CI walk to the front door of the residence.  (Id. at 133.)  Merkel testified that he "believ[ed]" the CI "made a phone call to let [Wade] know that he was there," but that he was "not sure what

happened or if [Wade] answered or not."[1]  (Id.)  The CI walked across the street and sat at a bus

stop facing the residence.  (Id. at 133-34.)  While the CI was sitting at the bus stop, Merkel could

not see whether he made any more phone calls—the CI was facing away from Merkel and was

wearing a hood.  (Id. at 134.)  Wade came out of the residence a few minutes later, and the CI

gave Wade fifty dollars.  (Id. at 133.)  Wade counted the money and handed the CI a small

quantity of crack cocaine.  (Id.)  The officers kept the CI under surveillance as he walked back to

meet Churilla.  (Id. at 135-36.)  The substance given to the CI by Wade tested positive as cocaine

on a field test kit.  (Id. at 136.)  Later that night, the officers completed an application for a

warrant to search Wade's residence for evidence of drug dealing.  (Id.)

      6.      The next morning, on January 28, 2010, a warrant authorizing the search of

Wade's residence was signed.  (Id. at 69.)

      7.      The search warrant described the premises to be searched as follows:

> The Premises of 3828 Penn Ave. Pittsburgh. Pa 16201. It is a 3
> story multi story family residence. The address in question is on
> the first floor, which leads directly onto Penn Ave. The front door
> is dark and has the address 3828 affixed to it. There is blue trim
> with 2 white windows to the right and left of the front door, and
> the mail box is black and fixed to the right of the front door. And
> All individuals at the execution of the search warrant.

(Jan. 28, 2010 Search Warrant (ECF No. 49-1) at 1.)

      8.      The affidavit in support of the application for the search warrant contained the

following averments:

> On 01/27/2010 at 1830 hrs Officer Merkel and I (Officer
> Churilla) met with a confidential informant about an individual
> selling crack cocaine from 3828 Penn Ave Pittsburgh, Pa. 15201.
> The actor is known to the confidential informant as aka: "Spider".
> We showed the confidential informant a picture of the individual,

---

[1] The affidavit in support of the application for a search warrant described the first call made by the CI, but did not state that the CI made a second call upon arriving at Wade's residence.  (Jan. 28, 2010 Search Warrant (ECF No. 49-1) at 2-3.)

who lives at the residence by the name of Thomas Wade . . . , who goes by the street name as "Spider". When the confidential informant saw the picture he/she I.D. Thomas Wade as the individual who is selling the crack cocaine. The confidential informant stated that he only sells fifty pieces ( $50.00 of crack cocaine). Based on this information, the target of our investigation will be Thomas Wade.

The confidential informant then called Mr. Wade by cell phone to the number of 412-583-9683, this number was given to the confidential informant by Thomas Wade. The confidential informant stated to Wade that he was looking for a fifty piece and he was up". Wade state to the confidential informant the "ya hit me up when you get here" . I (Officer Churilla) then searched the confidential informant for monies and contra band with negative results. This search of the confidential informant was witnessed by Officer Merkel.

Officer Merkel then left in an unmarked vehicle and went to the area of 3828 Penn Ave. to take up a fixed and secure location to observe the front door of the residence.

Once in his fixed and secure location Officer Merkel contacted me by cell phone and stated that he was ready. Officer Merkel used a pair of Cannon image stabilizer (15x50 IS UD 4.5 degree) binoculars. The confidential informant was then given fifty dollars of official serialized U.S. currency. . . . This money was photo copied by myself (Officer Churilla) before we left Zone 2 station.

I then contacted Officer Merkel at 1855 hrs and stated to him that I was driving the confidential informant from the our secure location to the target area of 38 28 Penn Ave. I then drove the confidential informant to the mid block of 39th St. (between Butler St. and Penn Ave). The confidential informant the exited my unmarked vehicle at 1857 hrs and started to walk up 39th st. to Penn Ave. I watched the confidential informant walk up the street until Officer Merkel made visual contact with the confidential informant. During this time the confidential informant never stopped to talk with any one. When the confidential informant made his/her way to the corner of 39th and Penn, Officer Merkel saw Thomas Wade exit 3828 Penn Ave. The area of 3828 Penn Ave. is illuminated by several street lights, giving Officer Merkel a clear view of 3828 Penn Ave. and Mr. Wade when he walked from his residence. When Mr. Wade come from the residence, he was wearing brown sweat pants, a dark colored long sleeve tee-shirt,

and had braids in his hair.  Mr. Wade then meet the confidential informant to the left side of the door of 3828 Penn Ave.  Officer Merkel then watched the confidential with his/her right hand give wade the U.S. Currency.  Mr. Wade then counted the money and then with his right hand gave the confidential informant the crack cocaine in his/her right hand.  Mr. Wade stated to the confidential informant" hit me up when you need more".  The confidential informant then walked back down to the 39th street, with Officer Merkel keeping visual contact with him until I (Officer Churilla) stated to Officer Merkel by cell phone that I had a visual contact of the informant.  The confidential informant then walked back to the mid block of 39th St. and got back into the unmarked vehicle.

Once back in the vehicle, the confidential informant gave me a ripped knotted baggie corner of crack cocaine.  I then drove back to the same secure location and searched the confidential informant for monies and contra band with negative results.  This second search was witnessed by Officer Merkel.  After finding nothing on the informant, he/she was released and we returned back to Zone two station.

I (Officer Churilla) then with latex gloves opened the ripped knotted baggie corner of crack cocaine, and placed it into a Scott's test kit.  When that small piece of crack cocaine was tested, it was positive( turned blue) for cocaine base.  Officer Merkel then placed the crack cocaine and the positive Scott's test kit in a evidence envelope and sent it to the property room as evidence. . . .

(Id. at 2-3.)

### B.  Phone Calls Receieved by Wade Prior to the Controlled Buy

9.      On January 27, 2010, between 6:30 p.m. (the approximate time Merkel and Churilla first met the CI to arrange the controlled buy) and 7:00 p.m. (the approximate time of the controlled buy), Wade received thirty-one inbound phone calls.  (Wade's Call Records, Defendant's Exhibit A ("Ex. A").)

10.     Bush testified that he knew Wade, and that one of the phone numbers associated with multiple of Wade's incoming calls during the relevant thirty-minute time period had belonged to him in January 2010.  (Hr'g Tr. Nov. 22, 2011 ("November Transcript") (ECF No.

66) at 49-50.)  Bush denied being the CI.  (Id. at 51.)  Bush did not recall placing any telephone

calls to Wade in January 2009, but believed he may have dialed the number by accident.  (Id. at

56-57.)  He also remembered losing his phone for a few days in January 2010.  (Id. at 65.)   Nine

of the thirty-one incoming phone calls during the relevant period are attributable to the phone

number used by Bush.  (Ex. A.)

     11.    Smith testified that one of the numbers on the call records belonged to him in

January 2010, that he did not allow anyone else to use his phone, and that he was not the CI.

(November Transcript (ECF No. 66) at 69-71.)  Four of the thirty-one incoming calls during the

relevant period are attributable to the phone number used by Smith.  (Ex. A.)

     12.    Getner testified that he had conducted an investigation of the remaining numbers

and concluded that three of the numbers on defendant's call records for the relevant time period

on January 27, 2010 were associated with landlines as opposed to cellular telephones.

(November Transcript (ECF No. 66) at 73, 75.)  Collectively, the three landline numbers account

for nine of the thirty-one incoming calls made during the relevant time period.  (Ex. A.)

     13.    Getner could not identify the owner of six of the relevant phone numbers,

accounting for nine total incoming phone calls during the relevant time period.  (November

Transcript (ECF No. 66) at 73-76; Ex. A.)  The person or persons who made the following calls

to Wade's phone number on January 27, 2010 and the content of the calls remain unknown:

| **From Number** | **Time** | **Answered?** | **Duration** |
|---|---|---|---|
| (412) 584-9815  ("Caller A") | 6:35:32 p.m. | Yes | four seconds |
| (412) 425-2645 ("Caller B") | 6:36:12 p.m. | Yes | seventy seconds |
| (412) 812-5042 ("Caller C") | 6:37:35 p.m. | Yes | twenty-three seconds |
| (412) 377-7377 ("Caller D") | 6:39:19 p.m. | Yes | five seconds |

| | | | |
|---|---|---|---|
| (412) 277-4364 ("Caller E") | 6:40:44 p.m. | Yes | nine seconds |
| Caller D | 6:45:07 p.m. | No | four seconds |
| Caller D | 6:46:14 p.m. | No | three seconds |
| (412) 583-6258 ("Caller F") | 6:51:30 p.m. | No | three seconds |
| Caller D | 6:51:53 p.m. | No | twenty seconds |

### C. Detention of Wade and Execution of the Search Warrant

14.     On the afternoon of January 28, 2010 (the same day the warrant was signed), the police executed the search warrant on Wade's residence.  (September Transcript (ECF No. 58) at 69.)

15.     Just before the execution of the warrant, Lincoln was traveling in an unmarked police car when he first observed Wade travelling in another car.  (November Transcript (ECF No. 66) at 11.)  Wade at that time was approximately two miles from his residence.  (Id.) Although the car in which Wade was travelling belonged to him, he was not driving, but was sitting in the front passenger seat.  (Id. at 10-11.)  Knowing that other police officers were on their way to execute a search warrant at Wade's residence, Lincoln and his partner, Officer Martin ("Martin"), began to follow Wade's vehicle in their unmarked police car.  (Id. at 11.) When it became apparent that Wade was heading toward the neighborhood in which he lived, Lincoln contacted Churilla.  (Id. at 11-12.)  Churilla told Lincoln to stop the vehicle and detain Wade before they executed the search warrant.  (Id. at 12.)  Churilla believed that "based on [Wade's] propensity for violence . . . , it was for the safety of [Wade] and also for us that [Wade] be detained prior to the execution of the search warrant."  (September Transcript (ECF No. 58) at 69.)  Wade was detained for the purpose of keeping him away from the residence during the

search.  (Id. at 100.)  Churilla was afraid Wade might arrive at the residence while officers were
conducting the search.  (Id.)

16.     Lincoln and Martin activated the lights and siren on their unmarked vehicle.
(November Transcript (ECF No. 66) at 11-12.)  The female driver of Wade's vehicle stopped the
car on the side of Herron Avenue, between Bryn Mawr Road and Webster Avenue.  (Id.)  The
location is approximately 1.5 miles (driving distance) away from Wade's residence.  (Id. at 18.)

17.     At 3:36 p.m. (September Transcript (ECF No. 58) at 99, 154), Lincoln and Martin
approached the vehicle and ordered the occupants to show their hands.  (November Transcript
(ECF No. 66) at 12.)  The car had three occupants: (a) defendant in the front passenger seat; (b) a
female driver; and (c) Johnson, who was sitting in the rear seat of the car.  (Id. at 14.)  The
officers ordered the driver to shut the car off.  (Id.)  They ordered defendant to exit the car.  (Id.)
Defendant was told to place his hands on the vehicle, whereupon one of the officers patted him
down for weapons.  (Id.)

18.     Lincoln testified that defendant was allowed to stand on the sidewalk, without
handcuffs, while the officers pretended to check his license for active warrants.  (Id. at 16.)
Lincoln wanted to delay Wade and to keep him relaxed.  (Id. at 15-16.)  Wade, on the other hand,
testified that he was ordered to his knees after he was searched, and that he was immediately
cuffed with a plastic zip tie.  (September Transcript (ECF No. 58) at 143-47.)  Johnson testified
that defendant was handcuffed and walked to the rear of the car where he was searched.  (Hr'g
Tr. Jan. 9, 2012 ("January Transcript") (ECF No. 70) at 7-14.)

19.     Johnson was initially told to remain in the vehicle. (Id. at 13-14.)

20.     Approximately five minutes later (id. at 8), a female police officer arrived to
search Johnson and the other female occupant of the car.  (November Transcript (ECF No. 66) at

16.)  Johnson was ordered out of the car; she was handcuffed and searched, and she could see that defendant was handcuffed at that point.[2]  (January Transcript (ECF No. 70) at 8, 14.)  She and the other female occupant were placed in a police car while Wade's car was searched, and were ultimately taken to a police station to be questioned.  (Id. at 9.) They were released from the police station after approximately two hours without being charged with any crimes.  (Id. at 18.)

21.    Meanwhile, at 3:51 p.m., after defendant had been detained on Herron Avenue, Churilla and other police officers executed the search warrant at Wade's residence.  (September Transcript (ECF No. 58) 97-98.)  After knocking and announcing, the officers waited approximately one minute before forcing their way into the residence.  (Id.)  Upon entry, they conducted a security sweep of the residence, which lasted approximately two minutes; during the initial sweep, police officers located two baggies of suspected marijuana in plain view on a dresser in a first floor bedroom.  (Id. at 72, 97.)  After finding the marijuana, Churilla radioed Lincoln, telling him to arrest Wade.  (Id. at 72-73.)  Lincoln arrested Wade, who was then transported to the police station by another police unit.  (November Transcript (ECF No. 66) at 19.)

22.    During the traffic stop, Wade was detained for between fifteen and twenty minutes.  (September Transcript (ECF No. 58) at 73, 98.)   Wade was not questioned and did not make any statements during the traffic stop.  (Id. at 72.)

23.    After radioing for Wade's arrest, Churilla and other officers continued the search of Wade's residence.  (Id. at 76.)   In the kitchen of the residence, officers found plastic sandwich bags from which the corners had been removed.  (Id.)  Drug dealers often use the corners of

---

[2] Lincoln also testified that Johnson and the other woman were permitted to stand on the sidewalk while their belongings and the car were searched.  (November Transcript (ECF No. 66) at 16.)  The court, however, finds the weight of the evidence favors the finding that all three individuals were handcuffed during the traffic stop while police officers searched the vehicle.

plastic sandwich bags to package and transport small quantities of illegal drugs. (Id.) Officers also found hidden stashes of cocaine, jewelry, and cash, as well as a digital scale, shotgun shells, and a sawed-off shotgun. (Id. at 76-78.) All these items were hidden in various places behind ceiling tiles. (Id.) One of the stashes contained a wallet with Wade's identification card inside of it. (Id. at 78.) Officers did not recover the serialized bills used by the CI in the controlled buy. (Id. at 78.)

24. After the search was completed, Churilla returned to the police station where defendant was detained. (Id. at 79.) Churilla and Lincoln took Wade into the back office. (Id.) They offered Wade an opportunity to use the restroom or have some food or drink. (Id.) They gave Wade a soda. (Id.) They read Wade his Miranda rights, which he understood. (Id.) Wade signed a Miranda rights form, indicating that he understood his rights, and was willing to speak to police without the presence of an attorney. (Id.) Wade then admitted to selling crack cocaine from his residence. (Id.) He denied that the shotgun found at the residence belonged to him—he stated that it belonged to another person, whom Wade had permitted to stay at the residence and to sell crack from the residence. (Id. at 80.) Wade provided a written statement and a taped statement, both of which detailed how he sold crack cocaine from the residence. (Id. at 81.) He admitted that his phone number was the same number used by the CI the day before to arrange the controlled buy. (Id.)

## II. Conclusions of Law

### A. Motion for a Franks Hearing

1. Under Franks v. Delaware, 438 U.S. 154, 155-56 (1978), when a warrant is obtained based upon a false statement made in a supporting affidavit, the fruits of the search

warrant must be excluded if the remaining material, following the excision of the falsity, is independently insufficient to support a finding of probable cause. If the falsity is based upon an omission rather than a misstatement of facts, the court must remove the falsehood by supplying the omitted information to the original affidavit, and subsequently determining if the affidavit with the added information contains sufficient probable cause. Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997).

2.      In order to obtain a Franks hearing, defendant must first make a "substantial preliminary showing" that (a) the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, (b) which is material to the finding of probable cause. United States v. Yusuf, 461 F.3d 374, 383 (3d Cir. 2006). If that showing is made, and a hearing is granted, defendant must prove by a preponderance of the evidence that: (a) the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (b) such statements or omissions were material, or necessary, to the probable cause determination. Id.

3.      To determine whether deficiencies in the affidavit are "material," the court must follow the following procedure:

> When faced with an affirmative misrepresentation, the court is required to excise the false statement from the affidavit. In contrast, when faced with an omission, the court must remove the "falsehood created by an omission by supplying the omitted information to the original affidavit."

Id. at 384 (quoting Sherwood v. Mulvihill, 113 F.3d 396, 400 (3d Cir. 1997). If probable cause still exists after the affidavit has been "corrected," then the deficiencies are not material. Id.

4.      To make a substantial preliminary showing, defendant must present more than conclusory statements or arguments. Yusuf, 461 F.3d at 383 n.8 ("In order to make this

preliminary showing, the defendant cannot rest on mere conclusory allegations or a 'mere desire to cross-examine,' but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses."); United States v. Heilman, 377 F. App'x 157, 177 (3d Cir. 2010).  In Heilman, the Court of Appeals for the Third Circuit outlined that requirement:

> To obtain a Franks hearing, the defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause."  To meet this threshold, a challenger must present more than conclusory statements that the affidavit contains false statements or omissions.  The challenger must specifically identify allegedly false statements or omissions in the affidavit and provide a statement of reasons supporting the argument.  The challenger must also provide an offer of proof or give a satisfactory explanation for the absence of proof.  Sworn affidavits or reliable statements from witnesses are examples of offers of proof sufficient to satisfy the substantial preliminary showing.  When demonstrating that the affiant omitted a material fact or included a false statement with the requisite *mens rea*, it is insufficient to prove the affiant acted with negligence or made an innocent mistake.  If the challenger provides sufficient proof and obtains a Franks hearing, the challenger must prove by a preponderance that (1) the affiant made false statements or omissions intentionally, knowingly, or with reckless disregard for the truth, and (2) such statements were material to the probable cause determination.  If the challenger satisfies this burden, we will excise the false statements and omissions from the affidavit and assess whether the corrected affidavit establishes probable cause.

Id. (citations omitted).

5.     Here, defendant argues that police manufactured nearly the entirety of the affidavit in support of the January 28, 2010 search warrant of Wade's residence.  Defendant argues that police never obtained information from a confidential informant relating to Wade's drug dealing, and that the police never conducted a controlled buy of crack cocaine using a

confidential informant.

6.      The alleged falsity, if it were proven, would be material.   Excising all
information about the CI and the controlled buy leaves only a brief summary of the law
enforcement experience of Merkel and Churilla and the criminal history of defendant.   That
information would not be sufficient to establish probable cause for the issuance of a search
warrant.   "Probable cause exists when 'there is a fair probability that contraband or evidence of a
crime will be found in a particular place.'"   United States v. Grubbs, 547 U.S. 90, 96 (2006)
(quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).   Probable cause determinations require the
magistrate judge to make a "practical, common-sense decision."   Gates, 462 U.S. at 238.

7.      Defendant did not, however, present a sufficient preliminary showing that the
affidavit contained a false statement.   He is, therefore, not entitled to a Franks hearing, and the
court must deny the Motion for a Franks Hearing (ECF No. 57).   Defendant presented no
evidence to contradict any of the averments made in the application for the warrant.   His attempt
to eliminate the potential callers (and by process of elimination present testimony that no
confidential informant called defendant at the appropriate time) failed.   The warrant application
contains a statement that the CI called Wade's phone sometime after 6:30 p.m. and before 6:55
p.m., which is when Churilla and the CI departed the police station heading to Wade's residence.
There are at least five telephone calls from unidentified callers (Callers A, B, C, D, and E) in that
time period which were answered, any of which could be attributable to the CI.

8.      Wade suggests that the call records do not support a finding that a single person
(the CI) called one time to arrange the buy and a second time to alert Wade that he was outside
of the residence.   Initially, the court notes that the affidavit in support of the warrant only
mentions a single telephone call.   The affidavit, however, alludes to the potential for a second

16

call because it described Wade telling the CI during the first call, "ya hit me up when you get here."  (Jan. 28, 2010 Search Warrant (ECF No. 49-1) at 2.)

9.      Defendant did not "present an offer of proof contradicting the *affidavit*," as is required to make a substantial preliminary showing.  Yusuf, 461 F.3d at 383 n.8 (emphasis added).  The testimony of Merkel suggests that there might have been a second telephone call when the CI arrived at Wade's residence, although Merkel was not entirely sure whether he remembered that or not.  The lack of a record of such a second call does not support a finding that there were falsities in the affidavit in support of the warrant application.  Instead, the phone records suggest the court should conclude that Merkel's memory regarding the second telephone call was faulty or that if a second call was made, it was not answered.

10.     If only a single phone call was made by the CI, any one of Callers A, B, C or E could have been the CI.  Defendant failed to consider the possibility that the phone call Merkel believed he observed while the CI was standing outside Wade's residence was unrelated to the controlled buy.  It is also possible, based on Merkel's testimony that his memory of the phone call was imperfect, that he misremembered a second phone call having been made.  In either of those two scenarios, any of the four unidentified callers could have been the CI.

11.     Defendant suggests a second phone call must have been made because Wade knew to exit his residence when the CI arrived.  The court notes that there are a variety of explanations for Wade knowing the CI was outside the residence, which do not involved a phone call being made.  Wade was aware the CI was on his way, and could have been waiting by the door or a window, or could have been occasionally checking to see if the CI had arrived.[3]

---

[3] The government argues that incoming calls are only recorded by the telephone company when the call is either answered or forwarded to voicemail.  The government suggests that a second phone call, if made, could have been unrecorded because Wade did not answer and the CI did not allow the call to be forwarded to voicemail.  Such information, if true, would refute the arguments raised by defendant.  The government did not, however, present

12.     If a second call was made by the CI, it could have been made by caller D and was not answered by Wade.

13.     None of the scenarios noted constitute a substantial preliminary showing that the affidavit contained a false statement which was material to the finding of probable cause because they all could be consistent with the affidavit.

14.     Because the burden is on defendant, and because Wade failed to present *any* evidence beyond speculation and conclusory allegations to show that any specific statement made in the affidavit was false, the court must deny the motion for a <u>Franks</u> hearing.  Defendant failed to meet his initial burden.


## B.  The Confessions and the Exclusionary Rule

15.     Defendant argues that the stop of defendant's car, his arrest and the search of defendant's person were not based upon reasonable suspicion or probable cause that defendant was engaging in criminal activity at that time.

16.     Stopping a car and detaining its occupants is a seizure under the Fourth Amendment to the United States Constitution.  <u>United States v. Hensley</u>, 469 U.S. 221, 226 (1985).  Such a stop is constitutional when it is based on an "articulable and reasonable suspicion that either the vehicle or an occupant has violated the law."  <u>United States v. Johnson</u>, 63 F.3d 242, 245 (3d Cir. 1995).

17.     The government bears the burden of proving that a traffic stop is supported by reasonable suspicion.  <u>United States v. Lewis</u>, No. 11-1136, 2012 WL 556065, at *8 (3d Cir. Feb. 22, 2012).

---

evidence to that effect during any of the three evidentiary hearings held on this matter.  The government may not rely on information unless it was introduced into evidence or is subject to judicial notice.  Neither of those situations occurred.

18.     Here, the government does not argue that Lincoln had a reasonable suspicion that the vehicle or one of its occupants had violated the law; rather, the government argues that the stop was justified by Michigan v. Summers, 452 U.S. 692 (1981).  In Summers, the Supreme Court held that the temporary, pre-arrest detainment of a suspect during the execution of a warrant to search his home was a "seizure" under the Fourth Amendment, but that such a seizure was reasonable in order to detain the subject, prevent flight, avoid violence during the search, and to aid in the search, and it is a less intrusive infringement of rights than an arrest.  Id. at 695, 701-04.  The Court commented:

> In assessing the justification for the detention of an occupant of premises being searched for contraband pursuant to a valid warrant, both the law enforcement interest and the nature of the "articulable facts" supporting the detention are relevant.  Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found.  Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers.  Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence.  The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.  Finally, the orderly completion of the search may be facilitated if the occupants of the premises are present.  Their self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand.

Id. at 702-03 (internal citations omitted).

19.     The government argues that the Summers analysis applies in this case because other courts have applied it to suspects who were not physically in their home during the execution of a search warrant.   United States v. Cochran, 939 F.2d 337, 339 (6th Cir. 1991) (holding Summers permitted police to detain a suspect departing the residence in his car, a "short

distance" from his home, before executing a search warrant because police believed the suspect always carried a gun and his home was protected by a guard dog) ("Summers does not impose upon police a duty based on geographic proximity (i.e., defendant must be detained while still on his premises); rather, the focus is upon police performance, that is, whether the police detained defendant as soon as practicable after departing from his residence."). But see United States v. Hogan, 25 F.3d 690, 693 (8th Cir. 1994) (holding Summers inapplicable where defendant was stopped three to five miles from his home, handcuffed and taken back to his house during the execution of a search warrant) ("The intrusiveness of the detention was . . . much greater than in Summers. Further, none of the law enforcement interests set forth in Summers apply.").

20. The courts of appeals are split with respect to whether Summers allows the detention of an occupant "who leaves the premises during or immediately before the execution of a search warrant and is detained a few blocks away." United States v. Bailey, 652 F.3d 197, 204 (2d Cir. 2011). In Bailey, the Court of Appeals for the Second Circuit held that such stops were permitted, agreeing with the Fifth, Sixth and Seventh Circuit Courts of Appeals, and disagreeing with the Courts of Appeals for the Eighth and Tenth Circuits. Id. at 204-07. Subsequently, the Court of Appeals for the Fourth Circuit decided in United States v. Montieth that it too would "decline to delineate a geographic boundary at which the Summers holding becomes inapplicable," but would "consider whether the police detained the individual as soon as practicable after observing him leave the residence." 662 F.3d 660, 666 (4th Cir. 2011). To date, the Court of Appeals for the Third Circuit has not ruled on the applicability of Summers when the defendant is observed leaving or going to premises by police officers who are about to exercise a search of those premises. The court finds the reasoning provided by the Courts of Appeals for the Second, Fourth, Fifth, Sixth, and Seventh Circuits persuasive and holds that there

is no bright line geographic boundary delimiting the bounds of a permissible detention under the authority of <u>Summers</u>.

21.    The court further concludes that the distinction is immaterial whether the officers stumbled upon the defendant on their way to execute a warrant, or observed the defendant actually leave the premises which were subject to the search warrant (as was the case in all the decisions cited in the above paragraph).  Even though defendant was stopped at a location away from his residence, the justifications underlying <u>Summers</u> are no less present here because, prior to the stop, he was observed travelling toward his residence.  In fact, some of the reasons for extending <u>Summers</u> to situations where a defendant has left the premises apply with much more force when police suspect that a defendant is returning to the premises—specifically, the concerns regarding officer safety are amplified by defendant's reasonably apparent, imminent return.  <u>See</u> <u>United States v. Norman</u>, No. 92-30045, 1993 WL 425964, at *5 (9th Cir. Oct. 21, 1993) ("The fact that the defendant in <u>Summers</u> was leaving the premises before the search commenced while Norman was returning home after the search had already begun, is a distinction without a difference.  Whether a defendant is detained upon leaving or returning to the premises bears no relationship to the intrusiveness of the seizure or the importance of the government's law enforcement interests; when a defendant returns home during the search, there is still danger that he will attempt to flee, harm officers, destroy evidence, or endanger occupants of the premises.")

22.    When Wade was stopped he was less than two miles from his residence, and he was heading in the direction of his residence.  It was reasonable, and not unduly burdensome, based upon the reasoning of <u>Summers</u> and its progeny in the courts of appeals, for police to detain defendant temporarily when it became clear that he was driving in the direction of his

neighborhood, and the residence about to be searched.  See <u>Bailey</u>, 652 F.3d at 197, 203 (holding

that it was permissible for officers to detain—for less than ten minutes—two suspects about a

mile from the residence police were going to search, reasoning that the detention was a minimal

intrusion on the suspects' liberty and was justified by a substantial governmental interest in

preventing flight, minimizing the risk of harm to the officers, and facilitating the orderly

completion of the search.)  Here, given the police officers' knowledge of defendant's violent

history, and the possibility that he was on his way to the residence with two unknown

individuals, it was prudent and reasonable for the police to detain Wade temporarily while

executing the search warrant.  The decision preempted a potentially unsafe confrontation at the

residence, where police ultimately discovered a gun, and prevented defendant from having the

opportunity to flee if he were alerted about the search of his residence by an observer.[4]   The

court must, therefore, deny the motion to suppress (ECF No. 37).

### C.  Fruit of the Poisonous Tree

23.     Defendant claims that all incriminating statements made after he was arrested

should be suppressed as fruit of the poisonous tree.  Even if defendant's detention had been

illegal, the court would still be compelled to deny the motion to suppress because his confessions

would not be fruit of the poisonous tree.  There were sufficient intervening events between the

detention and the confessions.

24.      "[T]he exclusionary rule reaches not only primary evidence obtained as a direct

result of an illegal search or seizure, but also evidence later discovered and found to be

derivative of an illegality or 'fruit of the poisonous tree.'"  <u>Segura v. United States</u>, 468 U.S.

---

[4] Courts consider the length of the detention when applying the <u>Summers</u> reasoning.  <u>See</u> <u>United States v. Bullock</u>, 632 F.3d 1004, 1021 (7th Cir. 2011) (holding a thirty-to-forty minute detention not unreasonable).  This is because the <u>Summers</u> analysis ultimately requires a court to "examine both the character of the official intrusion [including its length and severity] and its justification."  <u>Summers</u>, 452 U.S. at 700.   Wade's short detention, lasting between fifteen and twenty minutes, was not unreasonably prolonged.  <u>Bullock</u>, 632 F.3d 1021.

796, 804 (1984).  The fruit of the poisonous tree doctrine does not permit exclusion of evidence "simply because 'it would not have come to light <u>but for</u> the illegal actions of the police.'" <u>Segura</u>, 468 U.S. at 815 (emphasis added) (quoting <u>Wong Sun</u>, 371 U.S. at 487-88).  The proper test for exclusion of evidence is "whether, granting the establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  <u>Wong Sun v. United States</u>, 371 U.S. 471, 487-88 (1963).

25.  In <u>Dunaway v. New York</u>, 442 U.S. 198, 218 (1979), the Supreme Court held that that a confession given by defendant when, in violation of the Fourth Amendment, he was seized without probable cause and taken to the police station for questioning in an attempt to uproot evidence, was inadmissible where no intervening event broke the connection between his illegal detention and his confession.  A violation of Fourth Amendment rights may occur even when the defendant is mirandized following the illegal seizure.  <u>Brown v. Illinois</u>, 422 U.S. 590, 603–04 (1975).  A confession made following an illegal arrest is subject to the <u>Wong Sun</u> "fruit of the poisonous tree" analysis notwithstanding the proper adherence to <u>Miranda</u> procedures by the police.  <u>Id.</u> at 602–03.  To be admitted, the statement must be "'sufficiently an act of free will to purge the primary taint.'"  <u>Id.</u> at 602 (quoting <u>Wong Sun</u>, 371 U.S. at 486).  The <u>Miranda</u> warnings are a factor to be taken into consideration when determining whether the confession was obtained through the exploitation of a Fourth Amendment violation.  <u>Id.</u> at 603.  The <u>Miranda</u> warnings are not the only factor to be considered; rather, "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant."  <u>Id.</u> at 603–04.  The burden of showing admissibility rests on the prosecution.  <u>Id.</u> at 604.

26.    Here, even if the court had concluded that the detention of defendant was an illegal seizure, the court would not be compelled to suppress the confessions under the analysis provided in Brown.  There are substantial intervening events—the police executed a warrant at defendant's residence, the police discovered an abundance of highly incriminating evidence relating to defendant's illegal activity, the police lawfully arrested defendant for possession of marijuana, defendant was mirandized at least once, defendant signed a waiver of his rights, and at least two hours elapsed.  The government introduced an abundance of evidence showing there was no ill purpose in the conduct of the police (in fact, the court has concluded that the detention was reasonable) which might justify the harsh penalty of suppression.  All the factors enumerated in Brown favor admission of defendant's confessions made on January 28, 2010, even if the court had not already concluded that the evidence should not be suppressed under Summers.  There is no evidence suggesting that the police involved in this case were using the detention as an impermissible means of uprooting evidence, as was the case in Dunaway.

27.    For the reasons stated above, the motion to suppress must be denied.

**III.    Order**

AND NOW, this 26th day of March 2012, upon consideration of the parties' filings, the arguments made by counsel at the suppression hearings held on September 20, 2011, November 22, 2011, and January 9, 2012, and the testimony of witnesses and the evidence introduced at those hearings, IT IS HEREBY ORDERED that, in accordance with the findings of fact and conclusions of law filed herewith, defendant's motion to suppress (ECF No. 37) and motion for a Franks hearing (ECF No. 57) are DENIED.

By the court,

_/s/ Joy Flowers Conti_____
Joy Flowers Conti
United States District Judge